UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

HERBERT A. THESING,                                CIV. NO. 13-1079 (JRT/JSM)

     Plaintiff,                                REPORT AND RECOMMENDATION

v.

CAROLYN W. COLVIN,

     Defendant.


This matter is before the Court on cross-motions for summary judgment. [Docket Nos. 13 and 15]. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation by the District Court pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(c).

For the reasons discussed below, it is recommended that Plaintiff's Motion for Summary Judgment [Docket No. 13] be **GRANTED** and that Defendant's Motion for Summary Judgment [Docket No. 15] be **DENIED**.

## I.    PROCEDURAL BACKGROUND

Plaintiff Herbert Thesing protectively filed for disability insurance benefits ("DIB") on August 30, 2010. (Tr. 98). Thesing alleged an onset date of June 23, 2010, based on depression, bi-polar disorder, anxiety, panic attacks, Attention Deficit Disorder (ADD), Attention Deficit Hyperactivity Disorder (ADHD), migraines, sleep issues and a rotator cuff injury. (Tr. 106). The Social Security Administration ("SSA") denied Thesing's application on November 22, 2010, and on reconsideration on February 1, 2011. (Tr. 101-110). Thesing requested a hearing pursuant to 20 C.F.R. 404.929 et. seq. and 416.1429 et. seq. (Tr. 111-112). A hearing was held on May 10, 2012, before

Administrative Law Judge ("ALJ") Lisa Groeneveld-Meijer.   (Tr. 31-72).   Thesing was represented by counsel.   Edward J. Utities, a vocational expert ("VE") testified at the hearing, as did Thesing.   (Id.).

On May 22, 2012, the ALJ issued her decision denying benefits.   (Tr. 8-22).   On June 22, 2012, Thesing sought a review of the ALJ's decision by the SSA's Appeals Counsel.   (Tr. 7).   On March 15, 2013, the Appeals Council denied Thesing's request for review, making the ALJ's decision final.   (Tr. 1-6).   See 20 C.F.R. §§ 404.981, 416.1481 42 U.S.C. § 405(g); Browning v. Sullivan, 958 F.2d 817, 822 (8th Cir. 1992); 20 C.F.R. §§ 404.981, 416.1481.

Thesing sought review of the ALJ's decision by filing a Complaint pursuant to 42 U.S.C. § 405. [Docket No. 1].   The parties have now cross-moved for summary judgment.   [Docket Nos. 13 and 15].

## II.   PROCESS FOR REVIEW

Congress has prescribed the standards by which Social Security disability benefits may be awarded.   The SSA shall find a person disabled if the claimant "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment."   42 U.S.C. § 1382c(a)(3)(A).   The claimant's impairments must be "of such severity that (the claimant) is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."   42 U.S.C. § 1382c(a)(3)(B).   The impairment must last for a continuous period of at least twelve months or be expected to result in death.   42 U.S.C. § 1382c(a)(3)(A); see also 20 C.F.R. §§ 404.1509, 416.909.

If a claimant's initial application for benefits is denied, he or she may request reconsideration of the decision. 20 C.F.R. §§ 404.907-09, 416.1407-09. A claimant who is dissatisfied with the reconsidered decision may obtain administrative review by an ALJ. 42 U.S.C. §§ 405(b)(1), 1383(c)(1); 20 C.F.R. §§ 404.929, 416.1429. To determine the existence and extent of a claimant's disability, the ALJ must follow a five-step sequential analysis, requiring the ALJ to make a series of factual findings regarding the claimant's work history, impairment, residual functional capacity, past work, age, education and work experience. See 20 C.F.R. §§ 404.1520, 416.920; see also Locher v. Sullivan, 968 F.2d 727 (8th Cir. 1992). The Eighth Circuit described this five-step process as follows:

> The Commissioner of Social Security must evaluate: (1) whether the claimant is presently engaged in a substantial gainful activity; (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

Dixon v. Barnhart, 353 F.3d 602, 605 (8th Cir. 2003).

If the claimant is dissatisfied with the ALJ's decision, he or she may request review by the Appeals Council, though review is not automatic. 20 C.F.R. §§ 404.967-404.982, 416.1467-1482. The decision of the Appeals Council (or of the ALJ, if the request for review is denied) is final and binding upon the claimant unless the matter is

appealed to Federal District Court within sixty days after notice of the Appeals Council's action.  42 U.S.C. §§ 405(g), 1383(c)(3); 20 C.F.R. §§ 404.981, 416.1481.

Judicial review of the administrative decision generally proceeds by considering the decision of the ALJ at each of the five steps.  The Court is required to review the administrative record as a whole and to consider:

1.    The credibility findings made by the ALJ.

2.    The plaintiff's vocational factors.

3.    The medical evidence from treating and consulting physicians.

4.    The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.    Any corroboration by third parties of plaintiff's impairments.

6.    The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth plaintiff's impairment.

Cruse v. Bowen, 867 F.2d 1183, 1185 (8th Cir. 1989) (citing Brand v. Secretary of HEW, 623 F.2d 523, 527 (8th Cir. 1980)).

This Court's review is limited to determining whether the ALJ's decision is supported by substantial evidence in the record as a whole.  42 U.S.C. § 405(g); Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir. 2008); Johnson v. Apfel, 210 F.3d 870, 874 (8th Cir. 2000); Clark v. Chater, 75 F.3d 414, 416 (8th Cir. 1996).  "We may reverse and remand findings of the Commissioner only when such findings are not supported by substantial evidence on the record as a whole."  Buckner v. Apfel, 213 F.3d 1006, 1012 (8th Cir. 2000) (citation omitted).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401

(1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); see also Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Buckner, 213 F.3d at 1012 (quoting Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000)); see also Slusser v. Astrue, 557 F.3d 923, 925 (8th Cir. 2009) (citing Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)) (same); Cox v. Apfel, 160 F.3d 1203, 1206-07 (8th Cir. 1998) (same).

In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact for that of the ALJ. Hilkemeyer v. Barnhart, 380 F.3d 441, 445 (8th Cir. 2004); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993). The possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence. Culbertson, 30 F.3d at 939. The Court should not reverse the Commissioner's finding merely because evidence may exist to support the opposite conclusion. Buckner, 213 F.3d at 1011; Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994); see also Woolf, 3 F.3d at 1213 (the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding). Instead, the Court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Gavin v. Apfel, 811 F.2d 1195, 1199 (8th Cir. 1987); see also Heino v. Astrue, 578 F.3d 873, 878 (8th Cir. 2009) (quoting Jackson v. Bowen, 873 F.2d 1111, 1113 (8th Cir. 1989)) (same).

The claimant bears the burden of proving his or her entitlement to disability insurance benefits under the Act. See 20 C.F.R. §§ 404.1512(a), 416.912(a); Thomas

5

v. Sullivan, 928 F.2d 255, 260 (8th Cir. 1991). Once the claimant has demonstrated he or she cannot perform prior work due to a disability, the burden of proof then shifts to the Commissioner to show that the claimant can engage in some other substantial, gainful activity. See Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005).

## III.   DECISION UNDER REVIEW

The ALJ made the following determinations under the five-step process. At step one, she determined that Thesing had not engaged in substantial gainful activity since August 30, 2010, the date he applied for benefits. (Tr. 13). At step two, the ALJ found Thesing had the following severe impairments: right shoulder degenerative disease and rotator cuff tears/tendonitis, status post multiple surgeries; bipolar disorder, schizoaffective disorder, ADHD, borderline personality disorder; and amphetamine dependence (in remission) and cannabis dependence. [1] (Id.).

At step three, the ALJ found that Thesing's impairments or combinations of impairments did not meet or equal one of the listed impairments in 20 C.F.R. §404, Subpart P, Appendix 1. (Tr. 14). In particular, the ALJ concluded that Thesing's mental impairments, considered singly and in combination, did not meet or medically equal the criteria of Listings 12.02 (Organic Mental Disorders), 12.04 (Affective Disorders), 12.08 (Personality Disorders), or 12.09 (Substance Addiction Disorders). (Id.) In reaching this conclusion, the ALJ first considered whether the "B" criteria of the Listings were met— i.e. evidence of mental impairments that resulted in at least two of the following: marked

---

[1]     Thesing has not claimed that the ALJ committed any errors based on his physical impairments. Instead, he has focused exclusively on the ALJ's findings as they relate to his mental impairments. Consequently, this Court will not address in this decision the ALJ's discussion of Thesing's physical impairments or the medical evidence relating to his physical impairments in any detail.

restrictions of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration. (Id.).

With respect to activities of daily living, the ALJ indicated that Thesing demonstrated a good ability to independently initiate and sustain a wide range of activities, completed his personal cares, cared for a young child, worked on cars, and was generally independent in his activities of daily living. (Tr. 19, citing Tr. 293-300, 518-543, 605-616). The ALJ further observed that Thesing was not driving as a result of the suspension of his license due to child support payment issues, and not because of his mental impairments. (Id.). The ALJ found that Thesing had mild limitations in activities of daily living. (Id.).

As to social functioning, the ALJ stated that Thesing alleged that he had significant difficulty interacting with others and lost jobs as a result of these difficulties. (Id.). The ALJ disagreed, finding that Thesing maintained relationships with others, including his daughter, girlfriend and his girlfriend's daughter. (Id., citing Tr. 486-497, 553-565). Thesing visited his mother every other weekend and was described by his doctors as cooperative and pleasant. (Tr. 20). Nevertheless, as Thesing had demonstrated that his mental impairments limited some of his social interactions, the ALJ concluded that Thesing had moderate limitations in the area of social functioning. (Tr. 20).

The ALJ determined that Thesing had moderate difficulties with concentration, persistence or pace. (Id.). Although Thesing claimed to have significant problems in this area, the ALJ found that Thesing engaged in activities that suggested good

concentration and persistence, such as watching television, occasionally babysitting his girlfriend's daughter, and occasionally working on cars. (Id.). Further, on examinations, Thesing's attention, concentration, focus and memory were normal. (Id., citing Tr. 428-449, 553-565).

The ALJ concluded that Thesing had not experienced any episodes of decompensation. (Id.).

Having determined that Thesing's mental impairments did not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the ALJ concluded that the "B" criteria were not met. (Tr. 14).

The ALJ also considered whether the evidence established the presence of the "C" criteria of the Listings,[2] and determined that it did not. (Tr. 14-15).

---

[2]    To satisfy the "C" criteria of Listing 12.02 or 12.04, the claimant must show:

> a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
>
> 1. Repeated episodes of decompensation, each of extended duration; or
>
> 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
>
> 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C).

Before reaching step four, the ALJ determined that Thesing had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. 416.967(b) except that Thesing could never climb ladders, ropes or scaffolds; could occasionally crawl; and could not reach overhead or perform overhead work. (Tr. 15). Additionally, Thesing could only perform work that was limited to routine tasks with up to three to four steps; involving only simple work-related decisions; with few, if any work place changes; involving no contact with the public; and involving only brief and superficial interaction with coworkers. (Id.).

In arriving at this RFC, the ALJ considered Thesing's symptoms and the extent to which his symptoms could reasonably be accepted as consistent with the objective medical evidence and other evidence. (Id.). The ALJ engaged in a two-step analysis to determine if there was an underlying mental or physical impairment that could produce Thesing's pain or symptoms and if so, whether the intensity, persistence or limiting effects of his symptoms limited his functioning. (Id.). As to the first step, the ALJ determined that Thesing's medically determinable impairments could reasonably cause the alleged symptoms. (Id.). At the second step, the ALJ concluded that Thesing's statements about the intensity, persistence and limiting effects of his symptoms were not credible to the extent they were not consistent with an RFC of "light work." (Tr. 16).

In addressing the second step, the ALJ found that the objective medical evidence did not support the severity of Thesing's claimed symptoms. (Tr. 17). In support, the ALJ cited a psychological evaluation of Thesing performed in August, 2010 by Thesing's treating therapists, Barbara Aysta, Psy.D. and Craig Stevens, Ph.D., LP. (Id.). At this time, they reported that he was cooperative and attentive, he appeared mildly

depressed but his affect was congruent, and his attention, concentration and memory were normal. (Id.) The ALJ noted that Thesing's psychological test scores placed him in the low average range of cognitive functioning. (Tr. 18). While Drs. Aysta and Stevens had opined that Thesing was experiencing significant stress, suffered from bipolar disorder, and was diagnosed with schizoaffective disorder, ADHD, borderline personality disorder, amphetamine dependence in remission, and cannabis dependence, (id., citing Tr. 428-449), they also indicated that Thesing had begun taking psychiatric medication and attending psychotherapy. (Id.).

The ALJ indicated that Thesing continued with psychotherapy throughout 2010 and was observed to have good moods and affect. (Id.). In November, 2010, Thesing reported having positive relationships with his girlfriend and her daughter, but in December, 2010, he reported that he was using marijuana a couple of times per month. (Id.). Also in December, 2010, Drs. Aysta and Stevens reported that Thesing's medication compliance was "gamey" and that he would stop taking medications before seeing if they were beneficial. (Id., citing Tr. 486-497). At physical examinations in November and December of 2010, Thesing was observed to be alert, oriented, pleasant and cooperative with normal mood and affect. (Id., citing Tr. 457-464, 498-500).

The ALJ cited evidence that Thesing was not always compliant with his medication use, though in 2011, he reported that his symptoms had improved with his use of medication, his depression level was better and his personal relationships were going well. (Id., citing Tr. 566-581). In November, 2011, Thesing denied mood irritability and stated that he did not feel depressed; he denied any racing thoughts or impulsive behaviors; his eye contact was fair; he had no excessive anxiety; and his

focus and concentration were within normal limits.  (Id., citing Tr. 553-565).  The ALJ cited a physical exam conducted in December, 2011, by Dr. Niles Batdorf, Thesing's family practitioner, in which Thesing reported depression and anxiety, but the examination showed him to be normal psychologically.  (Id., citing Tr. 566-581).

The ALJ considered the opinions of Drs. Aysta and Stevens issued in September, 2010, that Thesing's ability to carry out simple directions and interact in the workplace was markedly impaired and that it was unlikely that he could sustain any type of employment.  (Id.).  On the mental RFC form completed by Dr. Aysta, she noted that his prognosis was good if he followed his treatment plan, and also noted that Thesing was in the process of medication adjustment.  (Id.)  She opined that Thesing had moderate limitation in his ability to carry out very short and simple instructions and make simple work-related decisions.  (Id.).  Dr. Aysta checked boxes indicating that Thesing had marked or extreme limitations in all other functional areas, and stated that he required unscheduled breaks and would miss more than three days of work a month.  (Id., citing Tr. 450-453).  Drs. Aysta and Stevens reiterated these opinions in March, 2012, and noted that Thesing's history of methamphetamine addiction was a significant factor in his diagnosis of bipolar disorder, with psychotic episodes.  (Id.).  They also reported that he continued to have difficulty with anger management triggered by alcohol or other recreational drugs, but he had been somewhat successful in maintaining healthy relationships and had stabilized as a result of medication management and psychotherapy.  (Tr. 19).  They opined that Thesing continued to have difficulty with required work functions.  (Id., citing Tr. 631-632).

The ALJ gave Drs. Aysta and Stevens' opinions little weight because their opinions were neither supported by nor consistent with the record. (Id.). Specifically, in 2011, Thesing reported improved symptoms, said his depression was more balanced, his personal relationships were going well, and he denied mood irritability, racing thoughts, or impulsive behaviors. (Id., citing Tr. 553-565). Further, Dr. Aysta and Dr. Stevens attributed Thesing's anger management problems to his use of alcohol and drugs, but he had experienced some stabilization as a result of treatment. (Id., citing Tr. 631-632).

In December, 2011, psychiatric nurse Pamela Jarvis, MA, APRN, submitted a letter stating that she had treated Thesing for bipolar disorder since 2008. (Id., citing Tr. 601-604). Jarvis stated that Thesing had psychotic episodes, labile affect and moods, and significant irritability that was only partially resolved with medication. (Id.). Jarvis opined that Thesing was unable to work in a competitive environment due to his mental illness. (Id.). Jarvis and Dr. Emory Ulrich, Thesing's treating psychiatrist, completed a medical source statement form and checked boxes indicating that Thesing's symptoms prevented him from completing all of the identified tasks for 10% or more of the workday, and indicated that Thesing required at least one break per hour and would miss more than three days of work per month. (Id.). The ALJ gave little weight to the opinions of Dr. Ulrich and Jarvis, stating that they were not consistent with Thesing's psychotherapy treatment records. (Id.). Further, Jarvis had noted that Thesing's eye contact was fair, he had no excessive anxiety, and his focus and concentration were within normal limits. (Id., citing Tr. 553-565).

In support of the RFC, the ALJ cited to Thesing's activities of daily living, social functioning, and concentration, persistence and pace as discussed above, and to the state agency opinion of Dr. Owen Nelsen dated November 10, 2010, that Thesing had mild limitations of daily living, moderate limitations in social function, and moderate limitations concentration, persistence and pace. (Tr. 19-20).

After determining that Thesing could not perform his former jobs with the assigned RFC, based on the testimony of the VE, the ALJ determined at the fifth step of the evaluation process that Thesing could perform many jobs that existed in the national economy, such as Packaging-Machine Operator/Machine Bander-and-Cellophaner, and bench work assembly jobs such as Small Products I Assembler and Photocopying-Machine Operator. (Tr. 21). Considering all of this information, the ALJ concluded that a finding of "not disabled" was appropriate under Medical-Vocational Rule 202.21. (Tr. 21).

## IV.    THE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT

Thesing challenged the ALJ's decision on several grounds. First, he claimed that he had met his burden of establishing his disability based primarily on the assessments of Dr. Aysta, Dr. Stevens and nurse Jarvis. Plaintiff's Memorandum in Support ("Pl. Mem."), pp. 5-11 [Docket No. 14]. Thesing argued that Drs. Aysta and Stevens noted severe limitations in his ability to work, and their opinions were supported by Jarvis' opinion, who, along with Thesing's psychiatrist Dr. Ulrich, had opined that Thesing was "preclude[d from] performance for 10% of an 8 hour work day" in many work-related categories. Id., p. 10 (citing Tr. 603). These providers also had opined that Thesing was "preclude[d from] performance for 15% of an eight hour day" in maintaining

13

attention and concentration for more than two hour segments, performing activities within a schedule, maintaining a regular schedule and being punctual, sustaining an ordinary routine without special supervision, performing at a consistent pace, getting along with others, and tolerating normal levels of stress. Id., p. 10 (citing Tr. 603). Dr. Ulrich and Jarvis supported their opinions by referencing a treatment history with Thesing dating back to March, 2008, medication management visits every 1 to 3 months, and documented psychotic episodes, labile effect and moods, and irritability. Id. (citing Tr. 602-603).

Further, Dr. Ulrich and Jarvis indicated that Thesing would require 2 unscheduled breaks every two-hour period due to irritability and psychotic episodes, and that he had a "medically documented history of chronic mental health disorder of at least 2 years duration which resulted in such marginal adjustment that even a minimal increase in mental demands or change in environment would be predicted to cause the individual to decompensate." Id., pp. 10-11 (citing Tr. 440, 492, 603-604).

According to Thesing, these opinions were the only examining opinions of record and were undisputed, and therefore he had met his burden to prove his disability by a preponderance of the evidence. Id., p. 11.

Second, Thesing contended that the ALJ improperly rejected the opinions of his treating providers without justification; instead stating only that the opinions of Dr. Aysta, Dr. Stevens, Dr. Ulrich and Jarvis were not supported by the record. Id., pp.13-14. The ALJ's citation to examples in the records that did not support these opinions ignored the SSA's preference that the ALJ take a "longitudinal" approach to the record, particularly in evaluating mental health impairments. Id., p. 14. Additionally, despite the occasional

improvements that the ALJ noted, Thesing maintained that she ignored the fact that he experienced variations in his symptoms and his psychotic episodes "cycle," as indicated by Drs. Aysta and Stevens. Id., p. 15 (citing Tr. 631). Moreover, the ALJ's analysis was incomplete when she cited examples in the record reflecting improvement when those same records indicated other issues. Id. (citing Tr. 19, 559, 631).

Third, Thesing argued that the ALJ erred in failing to consider and apply the six factors described in 20 C.F.R. §416.927 to evaluate the weight to give medical opinions: (1) examining relationship; (2) treatment relationship; (3) supportability; (4) consistency; (5) specialization; and (6) any other factors which tend to support or contradict the opinion. Id., p. 17.

Fourth, Thesing contended that the ALJ erred in relying on the opinion of Dr. Nelsen,[3] state agency reviewing psychologist, over the opinions of his treating providers, particularly where Dr. Nelsen did not have the benefit of the opinions of Dr. Stevens, Dr. Ulrich, Dr. Aysta and Jarvis when he completed his record review, he did not examine Thesing, and his opinions were issued nearly a year before the hearing. Id., pp. 18-20. "Eighth Circuit precedent is clear that opinions of non-examining state agency consultants do not constitute substantial evidence." Id., p. 18 (citations omitted).

Lastly, the ALJ erred in the hypothetical question she posed to the VE because she failed to incorporate the opinions of Thesing's treating sources, who opined that Thesing had significant limitations in the areas of handling criticism, interacting with

---

[3] Thesing and the Commissioner refer to State Agency Consultant Dr. R. Owen Nelsen as "Dr. Owen" or "Dr. Nelson Owen."

supervisors, maintaining a schedule and attendance, and tolerating normal work stress. Id., p. 20.

For all of these reasons, Thesing argued that remand was appropriate.

In response and in support of her own motion, the Commissioner contended that the ALJ properly assessed the opinions of Dr. Aysta, Dr. Stevens, Dr. Ulrich and Jarvis, along with Thesing's daily activities, treatment notes, and that substantial evidence in record supported the ALJ's decision.  Defendant's Memorandum In Support of Motion for Summary Judgment ("Def. Mem."), pp. 4-11 [Docket No. 16].  The Commissioner acknowledged that the record contained references to Thesing's low energy, low self-esteem, depressed mood, feeling hopeless, emotion lability, mood swings with racing thoughts, symptoms of anger, emptiness and difficulty with medication causing blackouts and cycling moods, hallucinations and inability to sleep, and cognitive testing that showed Thesing had weakness in the areas of acquired knowledge verbal reasoning and attention to verbal materials.  Id., p. 6 (citing Tr. 428, 431-434, 438, 444, 450, 451, 452, 453, 457-458, 488, 631).  Nevertheless, the ALJ found that the assessments of Drs. Aysta and Stevens of significant limitations were inconsistent with other evidence in the record that showed that Thesing had a more balanced depression level and improved interpersonal relationships.  Id., p. 6 (citing Tr. 19, 553, 563).  According to the Commissioner, even the report of August 10, 2011, by Drs. Aysta and Stevens, indicated that Thesing's mood was only slightly depressed and that his attention span and concentration were within a normal range.  Id., p. 7 (citing Tr. 429).

As to Jarvis's opinion that Thesing could not work, the Commissioner argued that Thesing selectively highlighted the most negative observations by Jarvis and ignored

her other treatment notes where she reported that Thesing had indicated satisfaction and effectiveness with his treatment regimen or that he had stopped taking his medications; had stated that many of his symptoms had decreased; had denied mood irritability, racing thoughts, or impulsive behavior; and had noted his eye contract was fair, he had no excessive anxiety, and his focus and concentration were within normal limits. Id., pp. 7-8 (citing Tr. 553, 557-58, 561, 564 653).  In fact, in May, 2012, Thesing reported that once he re-started his medication, he had little mood irritability, he had some depression but "not bad," his anxiety levels were low, and his main complaint was shoulder pain. (Tr. 653).  The Commissioner also took issue with Thesing's argument that the ALJ provided only a boilerplate explanation of her decision to reject the treating source opinions, noting that the ALJ supported her decision with specific citations to the record. Id., p. 8.

In response to Thesing's argument that the ALJ's selective focus on certain treatment notes ignored the SAA's directive to consider the longitudinal picture of his health, the Commissioner submitted that the ALJ had reasonably considered the record as a whole, which reflected stabilization with treatment.  Id., pp. 8-9.  While Thesing may have had variation in the level of his symptoms, the ALJ was entitled to find that they were not disabling and it was her duty to resolve any inconsistencies. Id., p. 9.

With regard to Thesing's allegation that the ALJ erred by relying on Dr. Nelsen's evaluation when more than half of the record was submitted after he rendered his opinions, the Commissioner contended that the ALJ did not rely exclusively on Dr. Nelsen's opinion, but also had cited to Thesing's response to medications and his daily activities.  Id., p. 10 (citing Tr. 18, 20).  In any event, Thesing failed to cite any specific

evidence in those later submitted records that would have changed Dr. Nelsen's findings "beyond the treating physician opinions addressed above." Id. Further, the majority of the evidence submitted after Dr. Nelsen made his findings related to Thesing's physical impairments. Id., p. 11.

Finally, the Commissioner argued that there was no error regarding the ALJ's hypothetical to the VE. Id. The ALJ properly included only those impairments supported by record evidence in her hypothetical and, therefore, committed no error. Id.

## V.    THE RECORD

### A.    Medical Evidence

Thesing had a chemical dependency assessment on December 22, 2009.[4] (Tr. 415-416). Thesing was diagnosed with cannabis dependence and amphetamine dependence, in remission. (Tr. 416). The evaluator recommended that Thesing attend and complete intensive outpatient chemical dependency treatment. (Id.). Thesing successfully completed an outpatient chemical dependency treatment program. (Tr. 425-427). When he was discharged from the program, his addiction counselor noted that Thesing had successfully completed his treatment plan objectives and that his prognosis was good if he followed through with aftercare plans, which included goals for leisure activity and relationships with sober people. (Tr. 426).

---

[4]    Records predating the alleged onset date of a claimant's disability "are nonetheless part of [the claimant's] case record" and cannot be categorically rejected as irrelevant. Lackey v. Barnhart, 127 Fed. Appx. 455, 458 (10th Cir. 2005) (citation omitted). A court may consider those records "in combination with evidence after the onset date to determine disability." DeBoard v. Commissioner of Soc. Sec., 211 Fed. Appx. 411, 414 (6th Cir. 2006).

On June 15, 2010, Dr. Aysta saw Thesing for a diagnostic assessment.  (Tr. 435-437).  Thesing referred himself and stated that he was experiencing major depression and wanted to "get back on medications."  (Tr. 435).  Thesing told Dr. Aysta that he had a history of aggression and anger control issues, and expressed feelings of hopelessness, helplessness, lack of interest in most activity, excessive worry and guilt feelings.  (Id.).  Thesing further reported that he "loses blocks of time" when his feelings become intense and that he was experiencing hypomanic episodes and suicidal ideation with a plan for killing himself by driving over a cliff, though he also stated that he would not follow through with the plan.  (Id.).  Dr. Aysta found that Thesing met the criteria of borderline personality disorder and had a pervasive pattern of instability in his interpersonal relationships.  (Id.).  Thesing endorsed a PHQ 9 score of 16.[5]  (Id.).  Dr. Aysta noted that Thesing was polite, had good eye contact and was cooperative.  (Tr. 436).  Thesing told Dr. Aysta that he wanted to be on psychotropic medication because he had racing thoughts, was only sleeping three hours a night at times, and at other times he could not get off the couch.  (Id.).  Dr. Aysta diagnosed Thesing with bipolar disorder, polysubstance dependence, and borderline personality disorder and ascribed a GAF[6] of 55.  (Tr. 436).  Dr. Aysta recommended that Thesing be seen for individual

---

[5]    The PHQ-9 is a Patient Health Questionnaire used to screen for and rate the severity of depression.  Patient Health Questionnaire (PHQ-9), Univ. of Mich. Health Sys., http://www.med.umich.edu/1_info/fhp/practiceguides/depress/phq9.pdf.  A score of 16 indicates moderately severe depression.

[6]    "[T]he Global Assessment of Functioning Scale [GAF] is used to report 'the clinician's judgment of the individual's overall level of functioning.'"  Hudson ex. rel. Jones v. Barnhart, 345 F.3d 661, 662 n. 2 (8th Cir. 2003) (quoting Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. Text Revision 2000) ("DSM-IV")).  A GAF score of 61-70 indicates that an individual has some mild symptoms (e.g. depressed mood and mild insomnia) or some difficulty in social, occupational or school

counseling and that he begin psychiatric medication assessment and management at the Range Mental Health Center.  (Id.).  Dr. Aysta also recommended that Thesing be referred to the Workforce Center for skills training.  (Id.).  Dr. Aysta's report was co-signed by Dr. Stevens, who treated Thesing for conduct disorder behaviors when Thesing was a teenager.  (Tr. 435, 437).

A progress note from psychiatrist Sujit Varma, M.D., dated June 22, 2010, indicated that Thesing was currently being prescribed Strattera, which is used to treat ADHD,[7] Seroquel (an antipsychotic drug), Citalopram,[8] Adderall,[9] and Celexa.[10]  (Tr. 448).  Dr. Varma noted that Thesing had "difficulty with concentration, restless, and moody . . . reports some mood swings . . . hasn't cut for six months."  (Id.).

Thesing saw Dr. Aysta on June 29, 2010, for individual counseling.  (Tr. 446-447).  Thesing told Dr. Aysta that he had vegetative feelings, self-injurious thoughts and that he had attempted suicide in the past.  (Tr. 446).  Thesing reported recurring thoughts of suicide, with a plan.  (Id.).  In the previous two weeks, Thesing had recurring thoughts of self-harm and Dr. Aysta reinforced with Thesing the need to call emergency

---

functioning (occasional truancy or theft within the household), but generally functions pretty well, and has some meaningful interpersonal relationships.  DSM-IV, p. 34.  A score of 51 to 60 indicates moderate symptoms or moderate difficulty in social, occupational or school functioning.  Id.  A score of 41 to 50 indicate serious symptoms or any serious impairment in social, occupational, or school functioning.  Id.

[7]     http://www.strattera.com/

[8]     Citalopram is an antidepressant.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a699001.html.

[9]     Adderall is used to treat ADHD.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601234.html

[10]    Celexa is an antidepressant.  http://www.rxlist.com/celexa-drug.htm

numbers for help if he felt suicidal.  (Id.).  Thesing said that he made a contract with himself not to engage in self-harmful behaviors and stated that he had some relief with the use of Seroquel.  (Tr. 447).

Dr. Aysta saw Thesing again on July 26, 2010.  (Tr. 444-445).  Thesing reported that he had been escorted out of a carnival the previous week for fighting with another man, who Thesing thought was bumping into him.  (Tr. 444).  Thesing thought the person was "out to get him" and got into a physical altercation.  (Id.).  Thesing reported that he had long-standing issues with aggression and in the twelfth grade had been placed in foster care, but became so assaultive that he did not finish high school.  (Id.).  Dr. Aysta worked with Thesing to reframe his cognitive distortions.  (Id.).

On August 10, 2010, Drs. Aysta and Stevens conducted a psychological evaluation of Thesing.  (Tr. 428-434).  Dr. Aysta wanted the evaluation to help aid in the diagnosis for possible ADHD-related impairments.  (Tr. 428).  In the evaluation summary, Dr. Aysta noted that Thesing endorsed drastic mood swings, hypomania, ongoing suicidal ideation, impulsivity, a history of self-cutting, and inappropriate and intense anger, which he had difficulty controlling.  (Tr. 429).  Dr. Aysta observed that Thesing's mood was mildly depressed and his attention span and concentration were within normal range, although Thesing "remains overwhelmed by the emotional upheaval of having his depression symptoms be so continuous."  (Id.).  Dr. Aysta administered the Wechsler Adult Intelligence Scale, Fourth Edition ("WASI-IV") and the Behavior Rating Inventory of Executive Functioning, Adult ("BRIEF-2").  Thesing's WASI-IV scores indicated that he was on the low average range of functioning, his perceptual reasoning score was on the high end of the low average, his verbal

comprehension was on the low end of the low average range, and his working memory ability fell on the low end of borderline. (Tr. 430-431). Thesing's working memory score indicated a weakness in his ability to attend to and remember information, manipulate information and formulate a response using that information. (Tr. 431). Thesing performed in the extremely low range in processing speed, which showed weakness in his ability to scan, sequence or discriminate simple visual information. (Id.).

Thesing's BRIEF-2 scores indicated that he was having "clinically significant difficulties in acting impulsively and stopping his behavior at an appropriate time." (Tr. 432). The Behavioral Regulation Index component of the BRIEF-2 indicated that Thesing "was likely experiencing some problems with modulating his emotions and behaviors and inhibiting impulses in order to successfully solve problems and more generally maintain self-regulation." (Tr. 432).

In her summary, Dr. Aysta noted that Thesing admitted psychotic thought processes, including seeing shadows of people walking and hearing voices that he cannot shut off. (Tr. 433). Dr. Aysta concluded that Thesing met the diagnostic criteria for: (1) Schizoaffective Disorder, Depressive Type; (2) Borderline Personality Disorder in light of his self-injurious behavior, difficulty sleeping and obsessive-compulsive behaviors; (3) ADHD-NOS [Not Otherwise Specified]. (Id.). Dr. Aysta noted that Thesing was functioning significantly lower than what would be expected on the basis of his General Ability Index score. (Id.). Dr. Aysta recommended that Thesing pursue psychiatric medication management and that his psychiatry and psychotherapy providers work on helping him improve his coping skills and in monitoring his psychotic thought processes. (Tr. 433). Dr. Aysta commented that additional testing might be

necessary if medication was not effective in alleviating Thesing's psychotic symptoms "which occurs occasionally in individuals who have used methamphetamines." (Tr. 434). Dr. Aysta ascribed a current GAF of 50. (Id.).

On August 20, 2010, Thesing was seen by psychiatrist Matthew Zak. (T. 440-441). Dr. Zak noted that Thesing was irritable and had a history of violence. (Tr. 440). Thesing told Dr. Zak that he had recently "cold cocked" someone on the chin and realized that he could get into trouble for it. (Id.). Thesing also reported poor concentration, distractibility, and task impersistence. (Id.). Dr. Zak prescribed an increased dose of Seroquel and Strattera and continued a prescription for Celexa. (Id.).

Thesing returned to Dr. Aysta on August 25, 2010. (Tr. 442-443). Thesing reported that Strattera was not helping him and that he continued to feel impulsive and impatient. (Tr. 442). Dr. Aysta reviewed the results of cognitive testing with Thesing, which indicated that he had ADHD. (Id.). Thesing practiced some cognitive behavior therapies to modify his anger impulses. (Id.).

On September 14, 2010, Dr. Aysta saw Thesing for outpatient therapy. (Tr. 438-439). Dr. Aysta noted that Thesing continued to have "severe" depression symptoms and continued to feel suicidal. (Tr. 438). Thesing stated that the last time he engaged in self-injurious behavior he took a welding gun and burned holes in his arms, but the progress notes did not indicate when that happened. (Id.). Thesing endorsed psychotic symptoms and delusions. (Id.). Thesing believed that the Seroquel he was taking had lost its effectiveness. (Id.). Thesing reported that his psychotic episodes had been present since he was 18 years old, and that he also experienced obsessive-compulsive behaviors. (Id.). Dr. Aysta noted that Thesing was happy about progress he had made

in his relationship with his girlfriend and her daughter and progress in keeping his behavior in check when he felt aggressive and irritable.  (Id.).  Nonetheless, Thesing stated that he still believed that he would "assault somebody if he had the opportunity when he is in this state."  (Id.).

On September 23, 2010, Thesing saw April Bovee, R.N. and Dr. Ulrich.  (Tr. 494-495).  Thesing reported that Seroquel was not helping with his anxiety.  (Tr. 494).  Thesing indicated that he was having suicidal ideation, without a plan or intent, but that his depression was high and he was having obsessive compulsive disorder symptoms of having to count everything.  (Id.).  Thesing's affect was flat.  (Tr. 494).  Dr. Ulrich found Thesing to be alert and oriented with intact concentration.  (Id.).

On October 4, 2010, Drs. Aysta and Stevens wrote to Matthew Ehrbright of Disability Specialist, Inc.[11] in connection with Thesing's application for benefits.  (Tr. 450).  In this letter they stated:

> Mr. Thesing has serious and persistent mental health symptoms, as well as cognitive deficits that have been life-long and problematic.  It is very unlikely that Mr. Thesing could sustain any type of employment because of the pervasive nature of his illness.  I have seen him since 06/15/10, for twice monthly sessions.  During this time, he has almost continuous psychotic thoughts, verbal and visual hallucinations.  He has begun stabilizing these symptoms through medication management and psychotherapy, however, he continues with severe symptoms.  His ability to carry out simple directions and interact in the workplace is also markedly impaired.

(Id.)

---

[11]    Disability Specialist, Inc.'s website states that they assist people in filing for benefits.  http://disabilityspecialist.net/index.html

Dr. Aysta enclosed with this letter a Mental RFC Questionnaire dated September 30, 2010.  (Tr. 451-453).  Dr. Aysta diagnosed Thesing with schizoaffective disorder, with an onset related to seven years of heavy methamphetamine use, ADHD, borderline personality disorder, and chronic mental illness.  (Tr. 451).  She assigned a current GAF score of 48.  (Id.).  Dr. Aysta noted that Thesing's highest GAF score for the past year ranged between 45 and 48 and that his prognosis was good if he followed treatment plans and responded appropriately to medications.  (Tr. 451).  Dr. Aysta stated that Thesing's symptoms had lasted over twelve months, and she did not consider him to be a malingerer.  (Id.).  Dr. Aysta found Thesing to be moderately limited in his ability to carry out short and simple instructions, and to make simple work-related decisions.  Tr. 452).  She found him markedly limited in his ability to remember short and simple instructions, locations and work-like procedures, understanding and remembering detailed instructions, carrying out detailed instructions, maintaining concentration for more than two hours, performing activities on a schedule, sustaining ordinary routines without special supervision, working in coordination with others without being distracted by them, and interacting appropriately with the general public.  (Id.).

Dr. Aysta found Thesing extremely limited in the areas of completing a normal work day without interruption from psychologically based symptoms, accepting instructions and criticism, getting along with co-workers, maintaining socially appropriate behavior, responding appropriately to changes in the work setting, being aware of hazards and taking precautions, traveling in unfamiliar places or using public transportation, setting realistic goals and working independently of others and tolerating normal levels of stress.  (Id.).

In support of her opinions, Dr. Aysta wrote that Thesing had cognitive testing that showed that he was functioning in the extremely low and borderline range in concentration, and which correlated with his diagnosis of Attention Deficit Disorder. (Id.).

Dr. Aysta indicated that Thesing would require unscheduled breaks during an 8-hour work day, in addition to the standard 15-minute morning and afternoon breaks, due to his physical and verbal outbursts, easy distraction, and almost daily severe mood fluctuations which would cause him to "be unsafe in regards to himself and others." (Tr. 453). Dr. Aysta estimated that Thesing would miss more than three days of work per month as a result of his mental conditions. (Id.). Dr. Aysta indicated that Thesing had a "[m]edically documented history of chronic organic mental, schizophrenic, affective or other disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do any basic work activity, with symptoms or signs currently attenuated by medication or psycho-social support,. . . ."[12] (Id.). As additional reasons why Thesing could not sustain competitive employment, Dr. Aysta listed his documented mental health history, beginning at age 10, and his "history of self-injurious behaviors as well as reckless disregard for other's safety." (Id.).

On October 4, 2010, April Bovee, R.N. and Dr. Ulrich also saw Thesing for a medication review. (Tr. 492-493). Thesing reported significant mood lability and reported that he was getting "set off and blowing [his] lid" regularly. (Tr. 492). Thesing stated that his mood changed daily from angry to happy to sad. (Id.). Thesing did not

---

[12]   This language generally tracks the "C" criteria of the Listings. See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C). However, neither paragraph (a) nor (b), which track subparagraphs 2 and 3 of the "C" criteria, (see n. 2, supra), were checked. (Tr. 453).

report symptoms of mania, but did have symptoms of depression with impulse control, which Dr. Ulrich found "highly related" to Thesing's depression.  (Id.).

On October 12, 2010, Dr. Aysta saw Thesing and noted that he started a new medication and was hopeful that it would help his symptoms of irritability, aggression, and mania.  (Tr. 490).  Thesing reported that he was having more positive interactions with his daughter through text messages and with his girlfriend's daughter.  (Id.). Thesing also reported that "most of his day" was taken up by counting anything in the room that he could count, as a response to anxiety.  (Id.).

On November 11, 2010, Dr. Aysta reported that Thesing had a "blackout" episode and ran his car off the road, hitting a tree.  (Tr. 488).  She noted that Thesing "continues with severe cycling moods" and was having "ongoing visual and auditory hallucinations."  (Id.).  Thesing had been unable to sleep and Dr. Aysta recommended that Thesing go to the emergency room and have himself admitted to the psychiatric unit.  (Id.).  Dr. Aysta noted that Thesing's psychotic episodes were increasing, as well as his continual psychotic hallucinations.  (Id.).  She noted that he "has both verbal and auditory hallucinations. . .  ."  (Id.).  Thesing's girlfriend drove him to the hospital.  (Id.).

Dr. Aysta saw Thesing again on December 2, 2010.  (Tr. 486-487).  Dr. Aysta noted that Thesing had ongoing "blow ups" with his girlfriend.  (Tr. 486).  Dr. Aysta also noted that Thesing's medical insurance had lapsed and that as a result, he was not filling his prescriptions.  (Id.).  Dr. Aysta described Thesing as "gamey" with his medications, forgetting to turn in paper work and discontinuing medications before seeing if they would benefit him.  (Id.).  Dr. Aysta worked with Thesing on his emotional over-reactivity and negative self-talk.  (Id.).

Dr. Aysta saw Thesing on December 30, 2010. (Tr. 553-554). Dr. Aysta noted that Thesing was experiencing a decrease in his hallucinations and that he had spent a pleasant afternoon with his daughter, her mother, his girlfriend and her daughter. (Tr. 553). Thesing referenced a recent felony charge in October, 2010, and how he felt that some of his family was against him and blamed him for this felony charge. (Id.).

On January 19, 2011, Thesing was seen by Jarvis at the Range Mental Health Center. (Tr. 555-556). Jarvis indicted that it was her first meeting with Thesing since 2008. (Tr. 556). Thesing told her that he was having frequent mood swings and mood irritability and that his focus and concentration were poor. (Id.). Jarvis indicated that Thesing had good eye contact, a neutral mood, congruent affect, and no evidence of psychosis. (Id.). On April 12, 2011, Jarvis saw Thesing again and Thesing told her that his medication was helping with mood irritability and that the Strattera was effective in improving his focus and concentration. (Tr. 558).

On May 20, 2011, Thesing told Dr. Aysta that his depression was more balanced, but he continued to hear voices and see shadows—though these symptoms were also improving "somewhat." (Tr. 559). Thesing talked about the triggers for his anger issues and reported that the only place he went was the "Crossroad." (Id.). Dr. Aysta wrote that Thesing realized that he "needs to keep himself out of situations that are potentially problematic for his anger" but that he also tended to isolate himself. (Id.). Thesing reported positive relationships with his daughter, girlfriend and his girlfriend's daughter. (Id.).

On August 10, 2011, Thesing saw Dr. Aysta, who noted that he had just been released from the Northeast Regional Corrections Center ("NERCC") following an arrest

on July 19, 2011, for driving while intoxicated. (Tr. 561). Dr. Aysta noted that "Herb was rather vague as to how his legal situations keep continuing as far as having physical altercations with people and vendettas from acquaintances he has had past conflicts with." (Tr. 561). Thesing reported that he was only taking Seroquel and that the "noises in his head are rumbling," but that he could shut them down so they are not incapacitating during the day. (Id.). Thesing also stated that he was seeing shadows and felt that he was "cycling" more than he had in the past. (Id.). Dr. Aysta wrote "[w]henever Herb takes one step forward he continues to fall back several steps and either ends up in jail or violating his probation which has been pretty much ongoing for the last four years." (Id.). Dr. Aysta further noted that Thesing had positive relationships with his daughter, girlfriend and his girlfriend's daughter, and that he reported that he had not engaged in any self-injurious behavior. (Id.). Thesing "contracted" with Dr. Aysta to keep himself out of problematic situations. (Tr. 562).

Jarvis reviewed Thesing's medications on November 8, 2011, and noted that Thesing had discontinued all of his medications, except Seroquel, three months previously because "they didn't seem to be working." (Tr. 563, 564). Thesing denied mood irritability, denied feeling particularly depressed, and Jarvis found his focus and concentration to be within normal limits. (Tr. 564).

On December 16, 2011, Jarvis wrote to Kelly Blad at Disability Specialist, Inc. in connection with Thesing's application for benefits. (Tr. 601-604). Jarvis noted Thesing's history of Bipolar Disorder with psychotic episodes, labile affect and mood and significant irritability, which was only partially controlled with medication management. (Tr. 601). According to Jarvis, "Mr. Thesing is unable to work in a

competitive setting due to mental illness." (Id.).  Jarvis and Dr. Ulrich completed a Mental Medical Source statement, on which they ascribed a GAF of 55 and stated that Thesing's highest GAF of the past year was 55.  (Tr. 602).  They described Thesing's prognosis as "poor," stated that his impairments had lasted longer than 12 months and that he was not a malingerer.  (Id.).  Jarvis and Dr. Ulrich filled out a grid, in which a check in Category III indicated that performance would be precluded for 10% of an 8-hour work day and Category IV would preclude performance for 15% or more of an 8-hour work day.[13]  (Tr. 603).

In Category III, Jarvis and Dr. Ulrich checked boxes for remembering locations and work-like procedures, understanding and remembering very short and simple instructions, carrying out very short and simple instructions, making simple work-related decisions, asking simple questions and requesting assistance, maintaining socially appropriate behavior, responding appropriately to changes in the work setting, being aware of normal hazards, and traveling in unfamiliar places and using public transportation.  (Id.).

In Category IV, Jarvis and Dr. Ulrich checked understanding and remembering detailed instructions, carrying out detailed instructions, maintaining attention and concentration for more than two hours, performing activities within a schedule, maintaining regular attendance and being punctual, sustaining an ordinary routine without supervision, working in proximity with others without being distracted by them, completing a normal work day and work week without interruption from psychologically-

---

[13]    Category I indicated that performance would not be precluded for any aspect of the job; Category II indicated that performance would be precluded for 5% of an 8-hour work day.  (Tr. 603).  No check marks were made in either Category I or II on this form. (Id.)

based symptoms and being able to perform at a consistent pace without an unreasonable number of rest breaks, accepting instructions and responding appropriately to criticism from supervisors, getting along with peers, setting realistic goals or making plans independently of others, ability to tolerate normal levels of stress. (Id.).

In explaining Thesing's limitations, Jarvis and Dr. Ulrich wrote that he had experienced psychotic episodes, had labile affect and moods and irritability. (Id.). Jarvis and Dr. Ulrich also indicated that Thesing would need unscheduled breaks of at least two breaks per two hours during an 8-hour day, in addition to the standard 15-minute morning and afternoon breaks, because of Thesing's irritability and psychotic episodes. (Tr. 604). Jarvis and Dr. Ulrich estimated that Thesing would miss work more than three days per month. (Id.). Further, Thesing's limitations, considered in combination, would likely produce "good" and "bad" days. (Id.). Jarvis and Dr. Ulrich indicated that Thesing had a "[m]edically documented history of chronic organic mental, schizophrenic, affective or other disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do any basic work activity, with symptoms or signs currently attenuated by medication or psycho-social support, and a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate."[14]

(Tr. 604).

---

[14]    Again, this language generally tracks the "C" criteria of the Listings.  See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C).

On March 28, 2012—about six weeks before the disability hearing—Drs. Aysta and Stevens provided an update to Disability Specialists, Inc. on Thesing's mental health status and functioning.  (Tr. 631-632).  They stated:

> [Thesing] was initially seen for therapy in June of 2010 by this writer and, at that time, presented with severe mood swings, emotional lability, and almost continuous auditory hallucinations.  Mr. Thesing also has a history of Borderline Personality Disorder symptoms in which he has cut on himself and has had parasuicidal thoughts and behaviors. He reports other Borderline Personality Disorder symptoms of feeling "empty," inappropriate and intense anger, and anger management.     He also has a history of methamphetamine addiction, which has been a significant factor in his current diagnosis of bipolar disorder with psychotic episodes.   He was last seen by this writer on January 9, 2012, and at that time, Mr. Thesing's overall mental health status was unchanged.  He had recently been released from NERCC after being arrested for driving while intoxicated.  At this visit, he also endorsed occasional visual hallucinations.  However, these episodes cycle and are not on a continual basis.  He also reported that the noises in his head do not seem to be increasing at this time, nor do they seem to be decreasing.  He continues to endorse difficulty with anger management and triggers which involve the use of alcohol and other recreational drugs.
>
> He has been somewhat successful in maintaining healthier relationships with his family of origin, his ex-wife and current significant other.   He is very motivated to work on his sobriety and staying clean from methamphetamines, as well as keeping his life more manageable.  He has had positive responses with developing a healthy relationship with his partner's daughter and also with his biological daughter, who lives in Duluth, Minnesota, with her mother.  Although he has had some stabilization as a result of medication management and psychotherapy, he continues to have difficulty with functions that are required in any work situation.  Because of this, it is very unlikely that Mr. Thesing could sustain any type of employment.  He is suffering from severe and persistent mental illness and his ability to carry out any simple directions or tasks in the workplace is markedly impaired.

(Tr. 631-632).

Thesing submitted two additional mental health records in connection with his appeal to the Appeals Council for review of the ALJ's decision. (Tr. 650-654). On January 9, 2012, Dr. Aysta noted that Thesing was seeing her for the first time in four months. (Tr. 650). Thesing reported that his mood was level, but his PHQ-9 score was 12.[15] (Id.). Thesing also reported that he had constant noises in his head, although there were times he could ignore it. (Id.). Thesing had been working on small engines in his basement, which relieved his stress and he reported recent poor communication with his daughter and her mother. (Id.). Dr. Aysta practiced communication skills with Thesing. (Id.). Additionally, Thesing relayed an incident in which he believed he had received a phone call from his ex-girlfriend, in which she insisted that he drive immediately to Duluth, Minnesota to a hospital, however, when he arrived in Duluth and called her, she had no information on an emergency room visit. (Id.) This incident lead Thesing to wonder if he knew what was real and what was not. (Id.). Dr. Aysta encouraged Thesing to work with his medication provider in regard to his concern about constant auditory hallucinations. (Tr. 651).

On May 9, 2012, Thesing saw Jarvis. (Tr. 652-654). Jarvis noted that Thesing had stopped taking his medications, but then went back to them when his mood "got bad." (Tr. 653). At this visit, Thesing's main complaint was his shoulder pain. (Id.). Jarvis observed no mood irritability and Thesing denied impulsive behaviors. (Id.).

---

[15] A PHQ-9 score of 12 indicates moderate depression. http://www.med.umich.edu/1info/FHP/practiceguides/depress/score.pdf

Thesing reported that his focus and concentration were "good" and Jarvis noted that he had good eye contact.  (Id.).

### B.    Psychiatric Assessment

In 2010, the SSA sought an opinion from Dr. Nelsen regarding Thesing's mental status.  (Tr. 465-467).  In seeking advice from Dr. Nelsen, the SSA stated:

> The claimant's [activities of daily living] show that the claimant spends most of the day in his pajamas and watches tv and the main meal he eats is cold cereal.  He reports that he is only able to get about 3 hours of sleep per night, only showers every couple of days, and that he needs constant reminders to take his medicine.  He also reports feeling that people are "out to get him" and he has become increasingly paranoid and rarely goes outside.  The claimant is partially credible based on the [medical evidence of record] and [activities of daily living].  Please review and complete a [Psychiatric Review Technique Form] and [Mental RFC].

(Tr. 467).  The SSA noted Thesing's history of depression, bipolar disorder, anxiety, panic attacks, ADHD, migraines, sleep issues, extreme symptoms of low energy, low motivation, daily depressed mood, feelings of hopelessness, emotional lability, low self-esteem, and on-going symptoms of suicidal ideation.  (Id.).  The SSA also referenced a mental status exam on August 10, 2010, at which time Thesing was diagnosed with Schizoaffective Disorder Depressive Type, ADHD NOS, Borderline Personality Disorder and had a GAF of 50.  (Id.).

On November 18, 2010, Dr. Nelsen completed a Psychiatric Review Technique form on Thesing.  (Tr. 468-481).  With respect to the "A" criteria of the Listings, Dr. Nelsen found that for Listing 12.02 ( Organic Mental Disorders), Thesing had ADHD and Borderline Intellectual Functioning.  (Tr. 469).  With regard to Listing 12.04 (Affective Disorders), Dr. Nelsen noted "bipolar vs. schizoaffective disorder."  (Tr. 471).  With

respect to Listing 12.08 (Personality Disorders), Dr. Nelsen indicated that Thesing had Borderline Personality Disorder. (Tr. 475). Additionally, Dr. Nelsen noted Thesing's cannabis dependence and dependence on amphetamines, which was in remission. (Tr. 476).

With respect to the "B" criteria of the Listings, Dr. Nelsen found Thesing had mild limitations in his activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and had experienced no episodes of decompensation. (Tr. 478). Dr. Nelsen left the "C criteria" of the listings on the form blank.[16]   (Tr. 479).

In his narrative, Dr. Nelsen noted a treatment note dated August 10, 2010, from the Range Mental Health Center in which the provider indicated that Thesing was mildly depressed with a congruent affect, and a June 15, 2010 treatment note in which the provider noted that Thesing had reported suicidal ideation with a plan and his history of self-cutting. (Tr. 480). Another note, dated September 14, 2010, stated that Thesing reported increasing depression and agitation. (Id.). On September 29, 2010, Thesing reported that he stayed in his pajamas all day, watched television and ate cold cereal. (Id.). Dr. Nelsen opined that "in some respects, it appears that claimant will intentionally engage in one activity to avoid another." (Id.)

Dr. Nelsen also completed a Mental RFC on Thesing on November 18, 2010. (Tr. 482-485). In the area of understanding and memory, Dr. Nelsen found that Thesing was not significantly limited in his ability to remember locations and work-like

---

[16]   Dr. Nelsen was directed to complete the section on the "C" criteria if Listing 12.04 applied and the paragraph B requirements of the listing was not satisfied. He did not do that. (Tr. 479.)

procedures and in his ability to understand and remember very short and simple instructions.  (Tr. 482).  Dr. Nelsen found Thesing was markedly limited in his ability to understand and remember detailed instructions. (Id.).   In the areas of sustained concentration and persistence, Dr. Nelsen found Thesing not significantly limited in his ability to carry out very short and simple instructions, to sustain an ordinary routine without special supervision and to make simple work-related decisions.   (Id.).   Dr. Nelsen found Thesing moderately limited in his ability to maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance and be punctual, work in coordination with others without being a distraction, and complete a normal work-day and work-week without interruption from psychologically-based symptoms and perform at a consistent pace without an unreasonable number of breaks.  (Tr. 482-483).  Dr. Nelsen found Thesing markedly limited in his ability to carry out detailed instructions.  (Tr. 482).

In the area of social interaction, Dr. Nelsen found Thesing moderately limited in his ability to interact appropriately with the public, but otherwise not significantly limited in his abilities to ask simple questions and seek assistance, accept instructions and respond appropriately to criticism, get along with co-workers and maintain socially appropriate behavior.  (Tr. 483).  In the area of adaptation, Dr. Nelsen found Thesing moderately limited in his ability to respond appropriately to change in a work setting, but not significantly limited in the areas of being aware of hazards and taking appropriate precautions, travel in unfamiliar places and use public transportation, and the ability to set realistic goals.  (Id.).

Dr. Nelsen concluded that Thesing: (1) had the mental capacity to concentrate on, understand, and remember routine, repetitive and 3-4 step uncomplicated instructions, but would be markedly impaired regarding complicated or technical instructions; (2) could carry out simple tasks, but his ability to carry out complicated tasks was impaired; (3) had a reduced ability to handle co-worker and public contact, but could handle brief and superficial contact; (4) could handle ordinary levels of supervision; and (5) could handle the routine stresses of a routine, repetitive work setting.  (Tr. 484).  Dr. Nelsen's findings were predicated on a finding that Thesing's statements regarding his symptoms were only partially credible.  (Id.).

Dr. Conroe affirmed Dr. Nelsen's findings on January 31, 2011.  (Tr. 507-509).

### C.    Adult Function Report

Thesing submitted an Adult Function Report dated September 29, 2010.  (Tr. 293-300).  Thesing stated he had depression, "snaps easily" and "doesn't get along with other people."  (Tr. 293).  Thesing reported that he stayed in his pajamas all day, watched television and was sleeping about three hours per night.  (Tr. 293, 294).  Thesing's girlfriend did his house work and chores and he did not cook—instead, he ate only prepared foods, cereal and sandwiches.  (Tr. 295).  Thesing reported that the left the house once a day to get the mail, did not handle any money, and no longer worked on cars or went outside "due to paranoia and depression."  (Tr. 297).  Thesing's social activities were limited to talking to his girlfriend.  (Id.).  Thesing reported difficulty with completing tasks and concentration—stating that he could only concentrate for four minutes at a time and could not follow written or spoken instructions. (Tr. 298, 299).  Thesing stated that he believed people were out to get him.  (Tr. 299).

37

D.     **Hearing Testimony**

Thesing testified that at the time of the hearing he was living with his girlfriend and her eight-year-old daughter.  (Tr. 37).  Thesing completed high school to the eleventh grade and then obtained a GED.  (Id.).  Thesing received special education services throughout his elementary and secondary school years for learning disabilities.  (Tr. 38).  Thesing testified that he could read provided the wording was easy, but had difficulty concentrating.  (Tr. 39).  Thesing did not handle money, and reported that his girlfriend handled all of their financial matters.  (Id.).  Thesing reported that on a typical day, he would wake up at 6:30, let his dog out and then stayed in the house all day.  (Tr. 44).  Thesing stated that he did not visit friends, nor did his girlfriend have friends to their home because of Thesing's mood swings.  (Tr. 44-45).  Thesing did not have a driver's license because of unpaid child support arrearages for his fourteen-year-old daughter.  (Tr. 45).  Thesing had not seen his daughter for about a year.  (Id.).  During the day, Thesing watched television.  (Tr. 46).  In the past, Thesing enjoyed working on cars and motorcycles, but his interest in that work had declined in the past year.  (Tr. 47).

The ALJ asked Thesing about a reference in his medical records to having auditory and visual hallucinations, and Thesing reported that they still occurred and that in the past he would hear voices telling him to harm himself.  (Tr. 48).  As a result, he engaged in self-cutting with razor blades.  (Id.).  However, Thesing testified that this behavior had gotten better with the help of medication.  (Id.).

Thesing's past work was as a roofer, which he testified he quit because he could not deal with the "mouthy" people with whom he worked; he stated he worked as "crew

person" (i.e. either assembling food or cooking, but not at the register) at a McDonald's restaurant, which he quit because a co-worker got "lippy" with him; and he worked as a stocker in a grocery store, which he quit because he had difficulty finding items in the stockroom.  (Tr. 49-50).  Thesing worked as a cashier at a truck stop, but he quit because he was under a lot of stress and could not "deal with the people at the time."  (Tr. 52).  Thesing also worked as a dishwasher, cook and as a laborer at a trucking company.  (Tr. 53).  Thesing left all of these jobs.  (Id.).  Thesing often chose to work a midnight shift on his jobs so he would not have to deal with people.  (Tr. 52).

Thesing testified that he had no income apart from state cash and food stamp benefits, and that he could add and subtract, but multiplying and dividing was more difficult.  (Tr. 55).  Thesing occasionally babysat for his girlfriend's daughter, but only for 10 or 15 minutes at a time—Thesing reported that either he or the daughter would have an "attitude problem" and then a day care provider would come to the house to pick her up.  (Tr. 56).

Regarding his use of drugs and alcohol, Thesing reported being a heavy methamphetamine user from 2000 to 2003, but then went through treatment.  (Id.).  Thesing reported being sober for about a year.  (Id.).  Thesing took Seroquel to help his concentration, which he testified helped "slightly" with his concentration and mood swings.  (Tr. 57).

The ALJ noted Thesing's history of leaving his jobs and asked if there were any of the jobs Thesing liked, in hindsight.  (Tr. 58).  Thesing reported that he liked the roofing job, and liked any job that kept him motivated and working with his hands.  (Id.).  The ALJ asked Thesing why he thought he could not work at all, and Thesing replied

that it was because of his mood swings and shoulder pain, and stated "I just don't get along with people . . . from what people have said, I always feel that I have to be right, so I'm always arguing."  (Tr. 61).  If Thesing could be "left alone" at a job, "it'd be fine."  (Tr. 62).

The ALJ solicited testimony from the VE, who testified that Thesing's previous work was as a roofer, sandwich maker, cashier, dishwasher, fast foods worker, stocker, landscaper, and insulator.  (Tr. 65).  The ALJ asked the VE if a hypothetical individual of Thesing's age,[17] education and work was ascribed a light exertional RFC, with the restrictions set forth in the RFC determination made by the ALJ, could perform any of Thesing's past work.  (Tr. 66).  The VE testified that this person could perform the job of dishwasher, as Thesing had performed it, and the job of fast food worker, provided the individual was working in the back of the establishment and not dealing with customers would fall within those parameters.  (Id.).  However, the individual could not perform the other jobs previously held by Thesing.  (Id.).  The VE testified that the jobs of fast food worker (limited to back of restaurant work) and dishwasher existed in significant numbers in the national and state economy.  (Tr. 67). Other jobs that would fall within the parameters described by the ALJ included light, unskilled wrapping and packaging, packaging machine operator, bench worker assembly occupations, assembler of small products and photocopy machine operator.  (Tr. 68).

The ALJ then asked the VE to assume the same hypothetical individual, but restricted to sedentary work.  (Id.).  The VE testified that the following work would fall within those parameters:  fishing reel assembler, lamp shade assembler, sorter, and

---

[17]     Thesing was 32 years old at the time of the hearing.  (Tr. 36).

table worker.  (Tr. 68-69).  The VE explained that the jobs he described provided for breaks of 15 to 20 minutes in the morning and afternoon with a meal break, and other short breaks for bathroom use.  (Tr. 70).  However, it would not be permissible for a person to walk off the shift.  (Id.).  The VE reported that his testimony was consistent with the Dictionary of Occupational Title and his professional experience.  (Id.).

## VI.   DISCUSSION

Before addressing the issues raised by the parties' cross-motions for summary judgment, the Court first sets out the principles guiding its decision.

At the third step of the sequential evaluation process, the ALJ must consider whether any of the claimant's severe impairments meet or equal one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appx. 1.  A person who meets or medically equals an impairment found in the listing of impairments in 20 C.F.R. 404, Subpart P, Appendix 1 is found to be disabled without further analysis.   20 C.F.R. §§ 404.1520(a)(4)(iii); 416.920(a)(4)(iii).   The claimant has the burden of proving that impairments meet or equal a listed impairment.  Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004) (citing Sullivan v. Zebley, 493 U.S. 521, 530-31 (1990)).

Before an ALJ considers whether a mental impairment meets or equals a listed impairment at the third step, there must first be a medically determinable mental impairment garnered from medical evidence from an acceptable medical source.  See Shontos v. Barnhart, 328 F.3d 418, 424 (8th Cir. 2003) ("The determination of medical equivalence is made based on medical evidence, supported by acceptable laboratory and clinical diagnostic techniques.") (citation omitted); Pratt v. Sullivan, 956 F.2d 830, 834-35 (8th Cir. 1992) ("The sequential process for evaluating mental impairments is set

out in 20 C.F.R. § 404.1520(a). These are gleaned from a mental status exam or psychiatric history, id., and must be established by medical evidence consisting of signs, symptoms, and laboratory findings.  See id. § 404.1508.").  In other words, the decision as to whether impairments are covered by or medically equal to a listed impairment must be based on expert medical opinion.  See Barnett v. Barnhart, 381 F.3d 664, 670 (7th Cir. 2004) (citing 20 C.F.R. § 1526(b)) ("Whether a claimant's impairment equals a listing is a medical judgment, and an ALJ must consider an expert's opinion on the issue."); Retka v. Comm'r of Soc. Sec., 70 F.3d 1272, 1272 (6th Cir. 1995) (table opinion) ("Generally, the opinion of a medical expert is required before a determination of medical equivalence is made.") (citing 20 C.F.R. § 416.926(b)); Modjewski v. Astrue, Civ. No. 11-C-8, 2011 WL 4841091, at *1 (E.D. Wis. 2011) (warning that an ALJ who makes a step-three equivalence determination without expert opinion evidence runs the risk of impermissibly "playing doctor") (citing Rohan v. Chater, 98 F.3d 966, 970 (7th Cir. 1996) ("The Commissioner's determination must be based on testimony and medical evidence the record . . . ALJs must not succumb to the temptation to play doctor and make their own independent medical findings."); Daniel v. Barnhart, Civ. No. 01-852 (JRT/AJB), 2002 WL 31045847, at *2 (D. Minn. Sept. 10, 2002) ("The decision as to whether impairments are medically equal to a listed impairment must be based on medical testimony.") (citing Fenn v. Shalala, 884 F.Supp. 267, 273-274 (N.D. Ill. 1995)).

Likewise, an ALJ cannot determine that a claimant's mental condition is not disabling for the purpose of assessing his RFC without a medical opinion to support that opinion.  See Lauer v. Apfel, 245 F.3d 700, 703-04 (8th Cir. 2001).

> Although the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence," Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000), we have also stated that a "claimant's residual functional capacity is a medical question," Singh, 222 F.3d at 451.  "[S]ome medical evidence," Dykes v. Apfel, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam ), must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's "ability to function in the workplace," Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000).

Id.

In determining a claimant's RFC, the ALJ "may not draw upon [her] own inferences from medical reports."  Nevland, 204 F.3d at 858 (quoting Lund v. Weinberger, 520 F.2d 782, 785 (8th Cir. 1975)).  Further, "[t]he opinions of non-treating practitioners who have attempted to evaluate the claimant without examination do not normally constitute substantial evidence on the record as a whole."  Shontos, 328 F.3d at 427 (finding that "the ALJ improperly drew inferences from the medical reports, and relied on the opinions of nontreating, nonexamining medical consultants who relied on the records of the treating sources to form an opinion of [claimant's] RFC."); Bowman v. Barnhart, 310 F.3d 1080, 1085 (8th Cir. 2002) ("Instead of developing the record from Dr. Plunk, in assessing Bowman's residual functional capacity, the ALJ improperly relied on the report of a state consultant, who did not examine Bowman. We remind the ALJ that 'opinions of doctors who have not examined the claimant ordinarily do not constitute substantial evidence on the record as a whole.'"); Nevland, 204 F.3d at 858 (relying upon non-examining, non-treating physicians to form an opinion on a claimant's RFC does not satisfy the ALJ's duty to fully and fairly develop the record).

It is also "well-settled" that "'it is the ALJ's duty to develop the record fully and fairly, even in cases in which the claimant is represented by counsel.'" Delrosa v. Sullivan, 922 F.2d 480, 485, n. 5 (8th Cir. 1991) (quoting Bishop v. Sullivan, 900 F.2d 1259, 1262 (8th Cir. 1990) (citing Dozier v. Heckler, 754 F.2d 274, 276 (8th Cir. 1985)). An ALJ need not go to "inordinate lengths" to develop a claimant's record, but she must "'make an investigation that is not wholly inadequate under the circumstances.'" Battles v. Shalala, 36 F.3d 43, 45 (8th Cir. 1994) (quoting Miranda v. Secretary of Health, Educ. & Welfare, 514 F.2d 996, 998 (1st Cir. 1975)).   "'There is no bright line test for determining when the [administrative law judge] has . . . failed to fully develop the record.  The determination in each case must be made on a case by case basis.'" Id. (quoting Lashley v. Secretary of Health & Hum. Servs., 708 F.2d 1048, 1052 (6th Cir. 1983)).

Consistent with the duty to properly develop the record, "[t]he ALJ is required to recontact medical sources and may order consultative evaluations only if the available evidence does not provide an adequate basis for determining the merits of the disability claim."  Sultan v. Barnhart, 368 F.3d 857, 863 (8th Cir. 2004) (citing 20 C.F.R. §§ 416.912(e), 416.919a(b)); see also, Boyd v. Sullivan, 960 F.2d 733, 736 (8th Cir. 1992) ("When a claimant's medical records do not supply enough information to make an informed decision, the ALJ may fulfill this duty [to develop the medical record] by ordering a consultative examination.")  "Moreover, '[i]t is reversible error for an ALJ not to order a consultative examination when such an evaluation is necessary for him to make an informed decision.'" Boyd, 960 F.2d at 736 (quoting Dozier, 754 F.2d at 276).

"The amount of weight given to a medical opinion is to be governed by a number of factors including the examining relationship, the treatment relationship, consistency, specialization, and other factors.  Generally, more weight is given to opinions of sources who have treated a claimant, and to those who are treating sources." Shontos, 328 F.3d at 426 (citation omitted); see also 20 C.F.R. §404.1527(c) (same).  "[T]he longer and more frequent the contact between the treating source, the greater the weight will be given the opinion." Shontos, 328 F.3d at 426.  "A treating source's opinion is to be given controlling weight where it is supported by acceptable clinical and laboratory diagnostic techniques and where it is not inconsistent with other substantial evidence in the record." Id.  Accordingly, an ALJ may discount or disregard a treating physician's opinion "where other medical assessments 'are supported by better or more thorough medical evidence,' or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Turpin v. Colvin, 750 F.3d 989, 993 (8th Cir. 2014) (citing Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000) (internal citation omitted).  An ALJ may also give less weight to a conclusory opinion by a treating physician. Samons v. Astrue, 497 F.3d 813, 818–19 (8th Cir. 2007).  However, Social Security Regulation 96-5p provides that an ALJ should re-contact a treating physician for clarification if the evidence does not support the treating physician's opinion.

Based on these principles, the Court concludes that the ALJ committed reversible error at the third step of her sequential analysis[18] and in her determination of

---

[18]    Thesing did not explicitly argue that the ALJ made an error in the third step of her analysis, but this was clearly the point of his contention that the ALJ ignored the opinions of his treatment providers regarding the "B" and "C" criteria of the Listings reflected in their evaluations. See Pl. Mem., pp. 5-12.

45

Thesing's mental RFC.   As a result, the matter should be remanded for further adjudication.

At step two of her analysis, the ALJ concluded that Thesing had severe mental impairments.  (Tr. 13).  At step three, she determined that Thesing's mental condition was not disabling, and that his impairments did not alone or in combination meet or equal any of the listings of impairments.  (Tr. 14).  However, there was no medical opinion in the record by any examining physician to support these determinations. Indeed, the only medical opinions in the record regarding Thesing's mental condition were rendered by his treating physicians, who opined that he was markedly or extremely limited (or precluded from performing 10 or 15% in an 8-hour work day) in his ability to sustain virtually all of the mental activities required to perform competitive work; he would require several unscheduled breaks in a normal work day; he, would be absent more than 3 days a month; and he had a "[m]edically documented history of chronic organic mental, schizophrenic, affective or other disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do any basic work activity, with symptoms or signs currently attenuated by medication or psycho-social support, and a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate."[19]  (Tr. 452-453, 603-04).

Similarly, in deriving the mental portion of the RFC, the ALJ pointed to no medical opinions in the record by an examining physician.  Instead, the only "medical"

---

[19]    This latter opinion by Dr. Ulrich and Jarvis, constitutes a finding that Thesing met the "C" criteria of the Listings, which if accepted, requires a finding of disability at step three.  20 C.F.R. §§404.1520(a)(4)(iii), (d).  There is no medical opinion in the record, by Dr. Nelsen, or any other provider to contradict this opinion.

support for the RFC was derived from Dr. Nelsen's report, which was issued 18 months before the hearing.  Dr. Nelsen did not examine Thesing and did not even have the benefit of the complete record.

Consequently, in reviewing the record as a whole, the Court is compelled to find that the ALJ's findings are not supported by substantial evidence in the record and are, in fact, flatly contradicted by the record, leaving the Court to find that the ALJ improperly substituted her judgment for that of Thesing's mental health care providers.

For example, in support of her determination that he only had mild limitations in activities of daily living, (Tr. 14), the ALJ cited Thesing's ability to complete his own personal care, watch his girlfriend's daughter, and work on cars— all of which she characterized as showing "a good ability to independently initiate and sustain a wide range of activities."  (Tr. 19).

But the evidence in the record as a whole indicates that Thesing was unable to sustain a "wide range" of activities—the records from his treating mental health providers state that he did very little during the day and was generally house-bound. Thesing testified that his typical day involving watching television although he had difficulty concentrating on the programs.  (Tr. 47).  On May 20, 2011, in the same therapy note in which Drs. Aysta and Stevens indicated that Thesing said his depression was "more balanced," these providers also noted that for the most part, he spent his time at home and "will only go out if he needs something," and that he continued to hear voices and see shadows.  (Tr. 559).

Likewise, the ALJ's conclusion that during examinations Thesing's attention, concentration, focus and memory were normal was contradicted by the evidence in the

record.  (Tr. 20).  In support of that conclusion, the ALJ cited to Exhibit 26F and also to Exhibit 12F (Range Mental Health Center notes dated June 15, 2010 to September 14, 2010).  (Tr. 428-449).  Included within Exhibit 12F is the psychological assessment signed by Drs. Aysta and Stevens dated August 10, 2010.  The cognitive testing done during that assessment showed that Thesing's Working Memory Ability was <u>not</u> normal, but fell on the low end of the borderline range.  (Tr. 431).

The ALJ also relied on the opinion of a family practitioner that Thesing's psychological state was "normal."  (Tr. 18, citing Tr. 566-567 (office visit notes of Dr. Batdorf, who saw Thesing for a pre-operative physical before an arthroscopy on his right shoulder)).  Dr. Batdorf was not qualified to render an opinion on Thesing's mental status and it was error for the ALJ to rely on his opinion rather than the opinions of Thesing's mental health providers.  <u>Holohan v. Massanari</u>, 246 F.3d 1195, 1202, n. 2 (9th Cir. 2011) (recognizing that "[u]nder certain circumstances, a treating physician's opinion on some matter may be entitled to little if any weight.  This might be the case, for instance, if the treating physician . . . offers an opinion on a matter not related to her or his area of specialization."  (citing 20 C.F.R. § 404.1527(d)(5)).

The ALJ's citation to references in the record to improvements in Thesing's mental health and stability, and his ability to maintain a relationship with his girlfriend and her daughter, babysit this young child (for 15 minutes or less), watch television, visit his mother every other weekend, and occasionally work on cars, (Tr. 19-20), are not representative of the record as a whole, and more critically, are an insufficient basis for giving the opinions of his long-time treatment providers little weight under 20 C.F.R. §404, 1527(c).  The record as a whole is replete with references <u>by his treating</u>

48

providers to Thesing's major depression, aggression and anger control issues, bi-polar disorder, self-injurious behaviors, violence, run-ins with the law, suicidal ideations, clinically significant difficulties with impulse control, psychotic thought processes, ADHD, obsessive compulsive symptoms, severe cycling moods, auditory and visual hallucinations, blackouts, communication issues, emotional lability, mood swings and general inability to be around others.  (Tr. 48, 429, 432, 433, 435, 438-440, 442, 444-445, 453, 455-456, 459, 488, 494-495, 559, 561, 601, 631-632, 650-654).  "An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding."  Denton v. Astrue, 596 F.3d 419, 426 (7th Cir. 2010) (citation omitted).

The point is this: if indeed the ALJ found conflicting evidence in the records of Thesing's mental health providers, drawing her own inferences from their reports, without any medical support, was clear error.  Instead, it was incumbent upon the ALJ to contact these providers directly for clarification pursuant to SSR 96-5p or to refer Thesing to a consulting examiner for an evaluation.

Finally, the ALJ's reliance on the non-examining consultant, Dr. Nelsen, for the RFC, was reversible error.  Not only was the RFC derived without medical support from an examining medical provider, but it was error to rely on Dr. Nelsen's report when he rendered his opinions based solely on the review of records and without the benefit of all of the records, including the critical assessments of Jarvis and Dr. Ulrich on December 16, 2011, (Tr. 601-604), and Drs. Aysta and Stevens on March 28, 2012, (Tr.

631-632).[20]   See Dixon v. Barnhart, 324 F.3d 997, 1002-03 (8th Cir. 2003) (finding that reviewing physician's RFC opinion does not constitute substantial record evidence when he did not have the benefit of the reports prepared by claimant's treating physician and the SSA's examining consultant to inform his RFC recommendation).   In light of the severity of Thesing's symptoms and the assessments of his treating providers that Thesing could not work as a result of his mental status, it was imperative for the ALJ to fully develop the record by directing that Thesing undergo a consultative psychological assessment by a provider who considered the all of the mental health records and statements of Thesing's treatment providers.

In the end, "to determine whether a claimant has the residual functional capacity necessary to be able to work we look to whether [he] has 'the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'"   Forehand v. Barnhart, 364 F.3d 984, 988 (8th Cir. 2004) (quoting McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc)) (abrogated on other grounds by Forney v. Apfel, 524 U.S. 266, 267 (1998)).   "Notwithstanding this well-settled case law, our mandate is frequently ignored." Id.   In this case, there was not substantial evidence in the record to support the ALJ's conclusion that Thesing is able to perform competitive work day in and day out.

In sum, this Court finds that the ALJ's determinations at step three and in the development of the RFC was without the required medical support, and she improperly relied on the opinions of Dr. Nelsen for the RFC, whose review was based on an

---

[20]   The Court notes that it was unclear whether Dr. Nelsen had even reviewed Drs. Aysta and Stevens' September 30 and October 4, 2010 assessments as there is no reference in his report to them or any of their contents.  (Tr. 450-453).

incomplete set of records.  Further, the ALJ failed to fully develop the record by contacting Thesing's mental health providers to the extent she found conflict or ambiguity in their reports, by ordering a consultative examination and complete review of all of the psychological records in the record, or by doing both.  Remand is required to develop a proper record.

## VI.    CONCLUSION

For the reasons discussed above, the Court concludes that the ALJ's decision to deny Thesing's application for SSI benefits cannot be upheld.  Therefore, it is recommended that Thesing's motion for summary judgment be granted and the ALJ's decision as it relates to Thesing's mental limitations be vacated.  It is also recommended that the Commissioner's motion for summary judgment be denied, and that this case be remanded for further administrative proceedings.  On remand, the ALJ should be directed to do the following:

First, the ALJ should fully develop the record with respect to Thesing's mental impairments and abilities by obtaining all of his psychological and psychiatric records.

Second, the ALJ should forward those records and all psychological and psychiatric records currently in the administrative record to one or more consultants who should review all of the records and conduct a psychological examination of Thesing to determine if his severe mental impairments meet or equal any of the Listings, and to determine his RFC, if it is determined that his mental impairments do not meet or equal the Listings.  The consultants should be directed to explicitly address the opinions of Thesing's treatment providers that he cannot work as a result of his mental impairments.

Third, the ALJ should contact Thesing's mental health providers to the extent the ALJ finds conflict or ambiguity in their records and needs more information to address this conflict.

Fourth, if the ALJ still concludes, after considering the new and fully-developed, medical record, that the opinions of Thesing's treating medical providers and his subjective complaints of disabling pain should be discounted, the ALJ should fully explain his or her position on those matters in light of the new record.

Finally, because the hypothetical questions posed to the VE were based upon a faulty determination of the RFC, the VE's answers to those questions cannot constitute sufficient evidence that Thesing was able to engage in substantial gainful employment. See Cox, 160 F.3d at 1207. Consequently, if the ALJ revises the determination regarding Thesing's mental limitations, the ALJ should solicit new testimony from a vocational expert to determine whether at step five of the evaluation process, there are any jobs that Thesing could perform given the ALJ's post-remand mental RFC determination. See Jenkins v. Apfel, 196 F.2d 922, 925 (8th Cir. 1999) (where a vocational expert's opinion is predicated on a faulty RFC determination, the ALJ cannot rely on that opinion); Nevland, 204 F.3d at 858 .

## VII.   RECOMMENDATION

For the reasons set forth above,

IT IS RECOMMENDED THAT:

1.      Plaintiff's Motion for Summary Judgment [Docket No. 13] be **GRANTED**; and

2.      Defendant's Motion for Summary Judgment [Docket No. 15] be **DENIED**;

3.    This matter be remanded for further adjudication consistent with this

Report and Recommendation

Dated: July 24, 2014

*Janie S. Mayeron*
JANIE S. MAYERON
United State Magistrate Judge

## NOTICE

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **August 7, 2014**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within fourteen days after service thereof.  A judge shall make a de novo determination of those portions to which objection is made.